UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.           )<br>)<br>ANDREA GOODE-JAMES,  )<br>           Defendant  )<br>) | Criminal No. 09-10170-DPW |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government's submits this Memorandum in support of its recommendation that the Court impose a prison term of 51 months, a sentence at the low end of the advisory guidelines range.

**Offense Conduct**

Defendant Andrea Goode-James pleaded guilty on July 12, 2009 to one count of mail fraud and three counts of wire fraud. Between 2005 and 2007, Goode-James, a now-disbarred attorney, was retained by lenders to perform three real estate loan closings, but she instead converted the loan proceeds for her own business and personal uses. Goode-James thereby defrauded the lenders, homeowners, and title insurance company of more than $1.1 million. See details at PSR ¶¶ 8-17.

**Goode-James's Advisory Guidelines Sentencing Range**

The government agrees with the PSR's application of the advisory sentencing guidelines. PSR ¶¶23-39. Goode-James' total offense level, after a three level acceptance of responsibility reduction, is 24. With a CHC of I, Goode-James' advisory sentencing guidelines range is 51-63 months. PSR ¶113.

The only guidelines enhancement to which Goode-James objects is the two level increase for her abuse of a position of trust as an attorney and title insurance agent (§3B1.3). That guideline requires a two level increase if the defendant "abused a position of public or private trust, or used

a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. §3B1.3. Goode-James does not contest the "significantly facilitated" element, arguing only that she did not occupy a position of trust. The facts and law are clearly to the contrary.

A position of public or private trust within this section is "characterized by professional or managerial discretion." §3B1.3, comment (n. 1). "Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Id. An attorney's embezzlement of client funds is the first example cited in the guidelines commentary for when this enhancement applies. Id; see United States v. Goldman, 447 F.3d 1094, 1096 (8th Cir. 2006) ("The commentary to the guidelines explicitly mentions attorney embezzlement of client funds and fraudulent loan schemes as examples which qualify for the enhancement.").

Goode-James committed her offenses while self-employed as an attorney. PSR ¶9, 92. She was not an "employee" subject to anyone's supervision. The December 2003 Application for Agency she submitted to CATIC reflects that Goode-James operated as an individual practitioner and was the only person authorized to sign checks drawn on her clients' fund account. Exh. 1.[1] Thus, no one supervised her day-to-day actions and she had complete control and discretion over her clients' fund account.

Goode-James has not identified a single case in which this enhancement was not applied to a lawyer prosecuted for embezzling client funds. All but one case she cites involved a low or mid-level employee. The exception is United States v. Gill, 99 F.3d 484 (1st Cir. 1996), in which the

---

[1] Citizens Bank records reflect that at one time her father, Matthew Goode, also had signature authority on her IOLTA account.

defendant falsely represented himself as being a licensed psychologist with an advanced degree, when in fact he was neither. In affirming the abuse of trust enhancement, the Court of Appeals noted that "the threat that animates the guideline . . . - <u>illustrated by the lawyer who bilks a client out of trust funds</u> or the doctor who sexually abuses a patient - is that wrongdoer's position facilitates the crime, reduces the chance of detection, or both." <u>Id</u>. at 489 (emphasis added). That is exactly the position held by Goode-James.

Her focus on the lenders' closing instructions misses the point. Goode-James was not an employee of any of the lenders. She operated a law practice in which all of her actions and decisions, including how she handled her IOLTA account, were completely unsupervised by anyone, including her lender clients. Thus, her position as a sole-practitioner attorney facilitated her crime and reduced her chance of detection.

In addition to abusing her position of trust as attorney for the lenders, Goode-James also abused her position of trust as an agent of CATIC. CATIC instructed Goode-James to sell title insurance policies only after performing a title search and determining that there were no encumbrances on the subject properties (PSR ¶11), but then left it to her professional skill and judgment to complete the work. As a sole practitioner, she did so with complete discretion and no supervision. Goode-James used her position to issue title insurance policies, and thus fraudulently bind CATIC, even though she knew there were encumbrances on the properties.

Finally, and in the alternative, a two level enhancement pursuant to §3B1.3 is appropriate in this case because Goode-James's offense involved the use of a special skill "not possessed by members of the general public and usually requiring substantial education, training or licensing." <u>Id</u>., comment (n. 5) ("Examples include . . . lawyers.").

**18 U.S.C. §3553(a)**

A review of the statutory sentencing factors set forth at 18 U.S.C. §3553(a) further confirms the appropriateness of a substantial prison sentence in this case.

The first of those factors is "the nature and circumstances of the offense." 18 U.S.C. §3553(a)(1). Goode-James's offenses involved a mail and wire fraud scheme which took place over a period of at least a year and a half (December 2005 - May 2007), during which she converted funds intended for three separate loan closings, causing a loss of over $1.1 million to the lenders and a title insurance company, and causing an indeterminate amount of financial loss and emotional anguish to two homeowner families. In each instance, Goode-James had ample opportunity to consider her actions before choosing to take the funds for herself. In each case, Goode-James attempted to cover up her actions by making payments for a period of time on the mortgage loans she was supposed to have paid off. Goode-James used her position and expertise as an attorney to carry out her crimes. Although she has been disbarred and will not be able to commit fraud as a closing attorney again (assuming no reinstatement), there is a need to send a strong message of deterrence to other practicing attorneys who may be tempted by hard financial times or just the ready access to their IOLTA accounts to dip into those funds for their own use. 18 U.S.C. §3553(a)(2)(B) ("The court . . . shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct."). That she has held herself out to others as a role model, <u>and continues to do so</u> (see her Career Roadmap for Girls), only increases the need to send a strong deterrent message.

Although Goode-James has refused to disclose how she used the money (PSR ¶103), a

review of her IOLTA and operating accounts provide a partial answer.[2]  Her IOLTA account statements reflect that during the period of the offense conduct, substantial amounts flowed through the account every month.[3]  The converted funds were commingled with other deposits and a significant amount appears to have been used for general operating expenses and in other real estate transactions.  However, a portion of the converted funds were also transferred to Goode-James's operating account, out of which she paid numerous expenses, many of which appear to have been personal.

From December 30, 2005, when the $273,203 Beauford Lane loan funds were wired to her IOLTA account, through February 8, 2006, Goode-James transferred about $48,000 to her operating account. Exh. 2 (IOLTA acct. stmts. 12/05-1/06); Exh. 3 (operating acct. stmts. 12/05-2/06).  From October 6, 2006, when the $480,439 Brookledge Street loan funds were wired to her IOLTA account, through November 13, 2006, Goode-James transferred about $110,000 to her operating account. Exh. 4 (IOLTA 10/06-11/06); Exh. 5 (operating 9/06-11/06).  From May 7, 2007, when the $508,962 Speedwell Street loan funds were wired to her IOLTA account, through June 7, 2007, Goode-James transferred over $50,000 to her operating account.  Exh. 6 (IOLTA 5/07-6/07); Exh. 7 (operating 4/07-6/07).  During those periods, Goode-James withdrew from the operating account

---

[2] Goode-James asserts in a letter to the Court that she used mortgage payoff funds to "temporarily . . . stop foreclosure on properties belonging to families in immediate jeopardy of losing their homes."  Letter at pg. 2.  Goode-James has offered no evidence to support that assertion and none of the letters sent to the Court on her behalf purport to be from anyone who claims to have benefitted from those alleged efforts.

[3] During its investigation, the government obtained the relevant account statements and a sampling of checks and withdrawal items from her IOLTA and operating accounts.  All such documents were made available to Goode-James's attorney, who reviewed them at the government's offices.

more than $10,000 in cash at ATM machines, and also paid for other expenses such as meals (Cheesecake Factory; Jae's Café and Grill; Chef Chang's House), clothing (Bloomingdales; Macys; Ann Taylor; Victoria's Secret), credit cards (MBNA; American Express), car loans (Land Rover; Volvo), and other miscellaneous expenses (Olive's Beauty Salon; My Nail Salon; Blue Man Group; Liquor Land; The Wine Emporium). Exh. 3, 5, 7. In June 2007, a month after she took the Speedwell Street loan proceeds, Goode-James wrote a $10,232 check from her IOLTA account to pay off her current husband's Jaguar car loan, and a $6,511 check to pay off his Volvo car loan. Exhibit 8. In March 2007, she wrote a $25,000 check on the IOLTA account to her mother with a reference to Goode-James's current residence address, a property owned by her mother. Exh. 9; PSR ¶65.

In addition to the substantial financial impact on the lenders and CATIC, the innocent homeowner borrowers have suffered ruined credit and, at least for the Bembridges, the foreclosure of their home. Mr. Bembridge's letter to the Court describes how "devastating" his family life has become because of Goode-James. Creditors call "morning, noon and night," and he and his wife's credit scores have dropped from 750/800 down to "0." Goode-James's actions have taken "a huge toll" on the Bembridges' lives and peace of mind.

Goode-James's history and characteristics (§3553(a)(1)) provide no support for a reduced sentence. To the contrary, Goode-James was raised by her parents in a "safe, residential upper-middle class neighborhood in Boston." PSR ¶46. Both her parents were professionals, as was her grandmother, with whom Goode-James was close. PSR ¶¶46, 53-54. Her parents provided her with a good education, beginning at Milton Academy and moving to Framingham North High School and the Jamaica Plain High School. PSR ¶83. She received an undergraduate degree from Roxbury

Community College, and her law degree from Northeastern University, which she attended with the aid of an academic scholarship. PSR ¶86. Despite the opportunities and advantages she was afforded, and all the effort it took her to become a lawyer, Goode-James chose to use her position to steal from her clients. Her commendable history of good works in the community is far outweighed by the serious harm she intentionally inflicted on the lenders who were providing loans to that community and the local homeowners who were borrowing the funds which she stole.

As for her decision to approach law enforcement about her actions, she did so only after the Board of Bar Overseers had begun an investigation and it must have been apparent to her and her attorney that with more than $1 million having been stolen, criminal charges were likely.

Finally, the fact that incarceration will have a negative financial and personal impact on her family is an insufficient reason for the Court to impose a probationary sentence. Such consequences on a defendant's family is something which is common to all defendants and, as such, "is contrary to 18 U.S.C. §3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants." See United States v. Rattoballi, 452 F.3d 127, 135 (2nd Cir. 2006) ("Every convicted felon suffers the indignity and ill-repute associated with a criminal conviction"). Nor is the fact that Goode-James has a very young child a reason to be more lenient, particularly since she made the decision to have this baby at the age of 44 when facing criminal charges and a likely prison sentence. In any event, Goode-James is married and her husband is available to care for their children.

**Conclusion**

For all the above reasons, the government requests that the Court sentence Goode-James to a term of imprisonment at the low end of advisory sentencing guidelines range (51 months), enter an order of restitution in the total amount of $1,141,861.20 to the persons and entities listed in the PSR at ¶129,[4] impose a $400 mandatory special assessment and three years of supervised release.

                      Respectfully submitted,

                      CARMEN M. ORTIZ
                      United States Attorney

By:    *s/Mark J. Balthazard*
          MARK J. BALTHAZARD
          Assistant U.S. Attorney

Date: December 2, 2009

Certificate of Service

I hereby certify that on December 2, 2009, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                      /s/ Mark J. Balthazard
                      MARK J. BALTHAZARD
                      Assistant U.S. Attorney

---

[4] One correction needs to be made to the PSR schedule. The entire amount of $273,203.94 in restitution for the Beauford Lane property should be made payable to HSBC (at the same address listed for the Speedwell Street property). CATIC has informed the government that HSBC was assigned the interest in the mortgage by Accredited Home Lenders, the original lender. CATIC advised that it expects to reach a final settlement with HSBC involving the payment of $105,000, but that it has not yet been finalized.