UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA          )
                                  )
                 Plaintiff,       )
                                  )
                                  )  No. 1:09-cr-10170
vs.                               )
                                  )
                                  )
ANDREA GOODE-JAMES,               )
                                  )
                 Defendant.       )
```

BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

<u>SENTENCING HEARING</u>

John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
December 7, 2009
3:15 p.m.

Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

```
 1
        APPEARANCES:
 2
             UNITED STATES ATTORNEY'S OFFICE
 3           By:  Mark J. Balthazard, AUSA
             1 Courthouse Way, Suite 9200
 4           Boston, MA 02210
             On behalf of the United States of America.
 5
             RANKIN & SULTAN
 6           By:  James L. Sultan, Esq.
             151 Merrimac Street
 7           Second Floor
             Boston, MA 02114
 8           On behalf of the Defendant.

 9

10      UNITED STATES PROBATION:  USPO Jennifer Sinclair

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     December 7, 2009):

7          THE CLERK:  All rise.

8        (The Honorable Court entered the courtroom at 3:15 p.m.)

9          THE CLERK:  This Honorable Court is now in session.

10    You may be seated.

11         This is the matter of United States versus Andrea

12    Goode-James.  Criminal Action 09-10170.

13         THE COURT:  Well, I have received the Presentence

14    Report, obviously, and the defendant's Sentencing Memorandum

15    with the numerous exhibits and the government's Sentencing

16    Memorandum and then the government's Motion for

17    Forfeiture/Money Judgment.

18         Now, are there any other written materials I should

19    have?

20         MR. BALTHAZARD:  The government also filed, your

21    Honor, the motion under 3E1.1(b), the third point.

22         THE COURT:  Yes, I have that.

23         MR. SULTAN:  Your Honor, there was just one exhibit

24    that was filed separately.

25         THE COURT:  Number 24.

1          MR. SULTAN:  24, and also 26 was filed separately

2     simply because it was a set of DVDs.

3          THE COURT:  Right.

4          MR. SULTAN:  That's all, your Honor.

5          MR. BALTHAZARD:  Your Honor, if I may, I just wanted

6     to advise the Court for the record that there are some victims

7     present in the courtroom, Lionel and Verona Bembridge and two

8     attorneys representing CATIC, the title insurance company,

9     Kevin O'Malley and Amanda Zuretti.  They have advised me that

10    they are not interested in addressing the Court, but obviously

11    if there are any questions they would be happy to answer them.

12         THE COURT:  All right.  Thank you.

13         Well, as I read the Presentence Report, the only issue

14    that seems to require my resolution is an objection to the

15    enhancement for abuse of trust, and I guess, Mr. Sultan --

16         Or maybe I should ask you, Mr. Balthazard, what is it

17    that provides some measure of discretion on the part of the

18    attorney for the title insurance company that we can call it an

19    abuse of trust for there to be some deviation?

20         MR. BALTHAZARD:  As an agent for the title insurance

21    company or as attorney for the lenders?

22         THE COURT:  First, agent of the title insurance

23    company.

24         MR. BALTHAZARD:  She is provided with discretion to

25    issue commitments that bind the title insurance company.

1    Obviously, she is supposed to do it in a certain way.  She's

2    only supposed to do it in connection with closings where she

3    has used her legal judgment to determine that, in fact, there

4    are not impediments to the title that would --

5         THE COURT:  Is that a legal judgment, that is to say,

6    title examination?

7         MR. BALTHAZARD:  I am not sure whether actually going

8    out and doing the title search is necessarily a legal task or

9    required to be done by an attorney, but the judgment in

10   reviewing that as to whether or not there is a lien on the

11   title or a problem with the title I would suggest is a legal

12   judgment that has to be made.  Even if it's not a legal

13   judgment, it's still a judgment that she has to exercise

14   independently of what the title insurance company is doing.

15   She has to make that determination and then issue a commitment

16   and bind the title insurance company.

17        THE COURT:  Well, what kind of review does she receive

18   from the title insurance company?  She receives instructions

19   from the title insurance company.  What kind of review does she

20   receive from the title insurance company?

21        MR. BALTHAZARD:  I don't know the answer to that as to

22   what they actually review, but they are not located in her

23   office.

24        THE COURT:  Maybe one of the victim representatives

25   can answer the question.

1          MS. ZURETTI:  I can, your Honor.

2          THE COURT:  If you could identify yourself for the

3     record, please.

4          MS. ZURETTI:  For the record, my name is Amanda

5     Zuretti.  I'm a title insurance underwriter for CATIC.  My last

6     name is spelled Z, as in "Zebra," -U-R-E-T-T-I.

7          On April 13th of 2009, Judge Tauro in a civil action

8     in this court, which is captioned Real Estate Bar Association

9     of Massachusetts --

10         THE COURT:  I am familiar with the litigation.  I am

11    more specifically concerned with what this defendant did in

12    connection with title insurance.

13         MS. ZURETTI:  I understand, your Honor.  It is not the

14    title insurance company that issues instructions to its title

15    agent as to how to conduct a closing and how to clear record

16    title.  The closing attorney receives instructions from the

17    lender, which, in short, require him or her to make sure that

18    the mortgage lien that is going to be recorded is going to be

19    in a contracted-for priority position and that it will be

20    properly perfected in that it's a secure transaction, and that

21    our recording statutes require that the mortgage be properly

22    recorded in the Registry of Deeds typically in first position.

23         It is, therefore, up to the title insurance agent, who

24    is typically the closing attorney who represents the lender, to

25    review an abstract of title, to clear any clouds or

1      encumbrances from that title, to handle the lender's documents

2      and the borrower's funds ethically and appropriately in

3      accordance with Massachusetts IOLTA rules and the lender's

4      instructions, to deliver the documentation to the Registry of

5      Deeds and to disburse the funds ethically and accurately in

6      accordance with IOLTA rules and the loan closing instructions.

7             After that time, it is the agent's responsibility, the

8      closing attorney, to issue a policy of title insurance that

9      conforms with what it is called a policy commitment.  In other

10     words, that is to issue an insurance document that provides

11     assurance to the lender that the mortgage instrument is

12     properly recorded in the public record and that the loan funds

13     are disbursed in accordance with the terms of the loan.  When

14     that is not done there is a loss suffered first to the

15     borrower, who is offering his or her home as collateral to

16     secure the repayment of loan funds, secondly to the lender, who

17     is offering the use of its money over time in return for

18     payment in the form of interest and, thirdly, to the title

19     insurance company that relies upon its agents to act ethically

20     and in terms of high standards of practice to make sure that

21     those requirements are met.

22             THE COURT:  In this connection it is necessary for

23     someone to be an attorney; is that right?

24             MS. ZURETTI:  In this state currently it is required

25     to be an attorney, and CATIC, because its corporate philosophy

1   is to support and promote the role of the attorney, you must be

2   an attorney in order to be a CATIC agent.

3          THE COURT:  Now, you have touched on something that I

4   wanted to explore a bit, and perhaps I could ask Mr. Balthazard

5   this, but I may ask for some additional information in just a

6   moment.  I want to understand how the losses are calculated for

7   the several victims in this case, how they lost funds.

8          MR. BALTHAZARD:  Is the Court referring to the

9   breakdown?

10          THE COURT:  Yes, yes.  I guess I just want to

11   understand are the victims severally adverse to each other now,

12   too?  I gather from the Bembridges' representations that they

13   are, that they face difficulties with the lender.

14          MR. BALTHAZARD:  Yes, your Honor.  We started from a

15   position of how much money was loaned and how much money did

16   Ms. Goode-James take from those proceeds.

17          THE COURT:  Right.

18          MR. BALTHAZARD:  And we reduced it for the specific

19   amounts from those loans that went to the borrowers, and in

20   this case both the Bembridges and Mr. Wood received a certain

21   portion.  We deducted those out to the extent that they had

22   been provided with some of the funds, it was not a large

23   amount, and it left a total of about $1,141,000 that had been

24   loaned and which had been taken by Ms. Goode-James.  And then

25   we looked to the amounts that CATIC had paid out on the claims

1   that were submitted, because with respect to each property,

2   when this all shook out, there were two lenders, two competing

3   mortgages on each of these properties, and there was a -- there

4   was one lender that had a title insurance policy with CATIC or

5   at least had a commitment that CATIC was going to honor, and it

6   was I think the second lender, if you will, that had this

7   policy with CATIC.

8           The way CATIC dealt with these, CATIC's obligation was

9   to put the lender, its insured, in the same position as it

10  would have been had there not been this cloud on the title, and

11  the cloud being in each of these cases that it was not in the

12  first lien position, there was a pre-existing mortgage that Ms.

13  Goode-James had failed to pay off and clear the title.

14          And what CATIC would do is, it would with each of the

15  properties, it would approach either its insured or the prior

16  mortgage holder and see which it could negotiate a settlement

17  with.  If it could negotiate a settlement with its insured then

18  it did so, it made a certain payment to it.  I believe with

19  respect to one of the properties it reached an agreement with

20  the prior mortgage holder, in which case by reaching that

21  agreement, having that mortgage discharged, it was putting its

22  insured in the same position which it had bargained for, which

23  was that it was the first lienholder on the properties.

24          We worked from the understanding that these were

25  legitimate loans, that they were fairly negotiated and freely

1    given by the lender, that there was no fraud in connection with

2    obtaining these loans.  That was the understanding that we

3    worked from in trying to determine where the restitution should

4    be paid to the extent that there is any funds to be paid.

5         THE COURT:  So, let me maybe sharpen this a bit or at

6    least focus on what I am interested in right now.

7         MR. BALTHAZARD:  Okay.

8         THE COURT:  CATIC makes whatever settlement it makes

9    with either the lender or the prior lienholder.  That means

10   CATIC is out that money.

11        MR. BALTHAZARD:  Right.

12        THE COURT:  In the case, for example, I am just

13   looking at the Beauford Lane property.  There is still a

14   balance after that, and the credited home lenders are out that

15   balance.  CATIC has to look to Ms. Goode-James, I guess --

16   putting to one side restitution in this case -- but in the

17   civil context they would have to look to Ms. Goode-James for

18   it.  The accredited home lenders look to the persons who had

19   the mortgage, I guess, is that right, like the owners of

20   Beauford?

21        I just want to understand who the various purported

22   recipients of restitution here have as alternative civil action

23   defendants.

24        MR. BALTHAZARD:  Just to clarify with respect to

25   Beauford Lane, the loan was ultimately resold; it was now with

1   HSBC.  I mention that, I included that in the Government's

2   sentencing memo to clarify.

3        THE COURT:  That just means they purchased whatever

4   chosen action.

5        MR. BALTHAZARD:  Yes.  I understand that this

6   settlement has not been completely finalized and it's close to

7   being.  But assuming it is done in the way that is set forth

8   here, which is what I believe the parties anticipate, at the

9   end of that CATIC will have paid $105,000, HSBC will have

10  settled for $168,000 less than it was due and owing as of the

11  time of this, I believe as of the time of the settlement, it

12  might have been an earlier period, and HSBC will, if I

13  understand it correctly, will assign all of its rights to

14  CATIC.  So, at that point HSBC would not have any rights

15  against the borrower.

16       THE COURT:  Okay.  And that's part of the settlement

17  with CATIC that the lenders had?

18       MR. BALTHAZARD:  It's my understanding that with

19  respect to each of these, whichever lender CATIC settles with,

20  CATIC obtains all of its rights, all of the rights on the

21  mortgage and on the note that previously belonged to that

22  particular lender.

23       THE COURT:  This, then, brings me to a third point.  I

24  am just trying to understand the universe here.  The

25  Government's motion for forfeiture; it is simply a collection

1   mechanism, then, on behalf of the victims?

2          I do not see the government as, unlike other cases,

3   the government being the party entitled to restitution, but

4   they are the ones who are moving for money judgment in the

5   Judgment and Commitment Order, and I just want to understand

6   how that works.

7          MR. BALTHAZARD:  The government does that as a matter

8   of practice under the law, seeks forfeiture.  I believe in

9   every case we attempt to do so.  If we obtain forfeiture of

10  property, my understanding is that it is not automatically

11  intended for restitution, although often that is in practice

12  what's done with it.

13         THE COURT:  Assume a case like this in which my

14  inclination would be that the priority goes to the people who

15  are actually out money, not to the government, that a fine is

16  unlikely, given the size of the restitution.  What is the

17  office of the forfeiture?  Are you simply a collection agent

18  for the restitution victims?

19         MR. BALTHAZARD:  Effectively, that's what we would be

20  in a position of.

21         THE COURT:  Why would I do it, then?  Having given

22  restitution to parties who are presumably capable of recovering

23  themselves, why would I do forfeiture?  I have never seen it

24  quite in this posture, so I am just a little uncertain about

25  how it works.  It is one thing when it is fraud against the

1    government, which is a customary mechanism for forfeiture, or

2    it is a so-called victimless crime but a crime in which there

3    is property that is kicking around and the government gets it,

4    but I do not understand what the government properly can get

5    here for forfeiture.

6         MR. BALTHAZARD:  There is no particular identified

7    property, obviously.  I know that I have had this in previous

8    cases, in fact, a recent case, where there was, in fact, funds,

9    stolen funds that the government seized, and we sought an order

10   of forfeiture which the Court entered, and then with respect to

11   that, because there actually was --

12        THE COURT:  Right.  A race.

13        MR. BALTHAZARD:  -- funds, then the victims were

14   entitled to make a claim against it, and I anticipate that they

15   will ultimately get that money.  In this case there is no known

16   funds, so that if the Court does not enter it there is not a

17   specific harm in this case because there is no known funds

18   available.

19        THE COURT:  Now, let me ask one other question, then I

20   will go back to the question of the enhancement.  The

21   government says that there was no information provided by the

22   defendant as to where this $1,100,000 and change went.  Is that

23   the case?

24        MR. BALTHAZARD:  The PSR reflected that the probation

25   officer inquired, and the report states that she declined to

1    provide any information at that point.

2         THE COURT:  Did the government ask in the course of

3    the proffer in connection with the plea?

4         MR. BALTHAZARD:  I don't believe there ever was a

5    proffer in connection with this plea.

6         THE COURT:  Well, the government has moved for a

7    reduction in the guideline for the acceptance of

8    responsibility, but we don't know where the money went.

9         MR. BALTHAZARD:  We have not had an answer from the

10   defendant as to where the money went.  I have attempted to lay

11   out the best -- the Government's been able to determine in the

12   sentencing memo based on a review of the IOLTA and operating

13   fund bank account records that we obtained in connection with

14   the investigation, and review of that reflects that the monies

15   are gone.  Where they went it's really not -- based on the

16   documents and the records we obtained, not able to say that the

17   funds went specifically here or specifically there.

18        There do not appear to be a direct correlation between

19   the monies that came in from these particular lender victims

20   and monies that went out.  The account statements and the

21   particular withdrawal items that we did get seem to reflect

22   that the funds were entirely commingled, that they were used

23   for other general operating purposes, including real estate

24   closings, but that also a significant portion was then

25   transferred to Ms. Goode-James' operating account and a

1    significant amount of personal expenses were paid.

2            THE COURT:  Well, when you say used for "real estate

3    closings," what does that mean?

4            MR. BALTHAZARD:  It appears, again just based on the

5    records we have, and we did not obtain every item reflecting

6    funds going out of that account during the period of time, and

7    one of the reasons was as we got going in this investigation

8    Ms. Goode-James did come in at a relatively early point and it

9    appeared --

10           THE COURT:  When did she first come in to you?

11           MR. BALTHAZARD:  I don't have the date, your Honor.

12   In fact, I took this case over after it was originally charged,

13   so I was not involved in the investigation prior to that, so I

14   don't have the date as to when she first came in.  I'm sure

15   Mr. Sultan will be able to answer that question.

16           THE COURT:  Let's go back then, Mr. Sultan, to the

17   question of enhancement for abuse of trust.  Isn't it the case

18   that, as recited by the CATIC representative, that there is a

19   fairly substantial amount of discretion involved and the

20   exercise of what at least in this state is called legal

21   judgment in the responsibility of a conveyancing attorney?

22           MR. SULTAN:  Well, your Honor, when I started looking

23   at this I simply assumed that Ms. Goode-James was an attorney.

24   Attorneys occupy a position of trust sort of professionally in

25   the world, and that would be enough.  But, since, obviously, as

1    the Court knows now, it's a functional analysis, is there a

2    substantial discretion exercise.  To me, and I have never been

3    a closing attorney, but just reading these instructions that

4    are in the record, I mean, I could think of almost nothing more

5    ministerial than basically you have to go to the Registry of

6    Deeds, you have to check the title to see if there's any

7    encumbrances, you have to basically certify there are no

8    encumbrances, and you have to disburse the funds according to

9    the precise, specific instructions of the lender.  There's no

10   discretionary judgment involved then in that process.

11        THE COURT:  Isn't there discretionary judgment

12   exercised in the certification?  You look at a title.  The

13   title may run for a fairly substantial period of time -- it may

14   have all sorts of liens and encumbrances on it, and you make a

15   judgment about whether or not to certify.

16        MR. SULTAN:  Well, if in the abstract you could say

17   there are certainly situations where it could be a question of

18   judgment, then you have the second prong, which is that you

19   have to show that the exercise -- that that was involved in

20   these particular transactions, and there's nothing I have seen

21   in any of these three transactions that indicated that were any

22   particular title issues or any close questions or any judgment

23   involved.

24        THE COURT:  You mean that there has to be proof in

25   each individual case that there was some challenge presented by

1   the responsibility of the closing attorney in a title search?

2           MR. SULTAN:  Well, no, your Honor, but that the

3   position of that -- that the substantial -- that the position

4   of exercising substantial discretion, there must be some nexus

5   between that position and the offense that was committed, the

6   idea being that being in that position to exercise discretion

7   contributed in some causal way to the actual offense.

8           THE COURT:  Well, but there is nobody here among the

9   victims or her principals, because I guess there are really two

10  principals here, one, the title insurance company and the other

11  the lender, who exercises any judgment with respect to

12  certification or determining whether or not the title is clean,

13  clean enough to permit the monies to be expended.  It all falls

14  on her.

15          MR. SULTAN:  It does, your Honor, yes, that's true,

16  and the question, I suppose, is whether she is exercising

17  substantial discretion or whether she is simply carrying

18  administerial tasks.  I can see the arguments both ways, but I

19  think that given her responsibilities, how they are laid out

20  and what she did in these cases, to call this an exercise of

21  substantial discretion I think is a stretch.  That's the

22  argument.

23          THE COURT:  I understand the argument, I think.  I

24  reject it.  This, it seems to me, is one of those areas in

25  which attorneys exercise substantial discretion upon which a

1    great deal of money rests, and they look to the exercise of

2    judgment by those who do the title conveyancing work for them.

3           So, I do reject the challenge to the enhancement for

4    abuse of trust.

5           I note also, and the government has as well, that an

6    alternative way of looking at this is under 3B1.3, that she was

7    exercising a special skill that is not possessed by members of

8    the general public and usually requires substantial education,

9    training or licensing, and so for those reasons I overrule the

10   objection there.

11          Now, is there any other matter under the *Guidelines*

12   that we need to take up?

13          MR. SULTAN:  No, your Honor.

14          THE COURT:  So that we're clear on the *Guidelines*,

15   then, we are dealing, principally because of the amount of

16   money involved here, with a total Offense Level of 24, 16 of

17   which is generated by a loss of more than $1 million to several

18   victims and a gain of more than $1 million to the defendant.

19   She has a Criminal History Category of I, she has no prior

20   convictions, and under these circumstances the guideline range

21   is 51 to 63 months' incarceration, supervised release for two

22   to three years and a fine in the range of $10,000 to

23   $8,585,376.  There is restitution in the amount of

24   $1,141,861.22, and there is $400 worth of mandatory Special

25   Assessments.  Are we dealing with the same set of numbers here?

1          MR. BALTHAZARD:  Yes, your Honor.

2          THE COURT:  Now, I do want to, because it goes to the

3    judgment, pursue the forfeiture issue.  I guess I just do not

4    understand why I should be making a money judgment of

5    forfeiture here.  Is there anything else beyond what we have

6    discussed?

7          MR. BALTHAZARD:  There is nothing else to add.

8          THE COURT:  So, I think I should tell the parties that

9    I am not going to make that money judgment forfeiture in this

10   case.  I just have some substantial questions, but I do not

11   think they should deter us here, because we have victims who

12   are, I think, capable of defending themselves in this context.

13         Now, I do want to hear a little bit from the

14   government.  Of course, I have its recommendation, which I

15   understand to be 51 months' incarceration.  Is there anything

16   further that you want to say?

17         MR. BALTHAZARD:  Yes, your Honor.  The recommendation,

18   as included there, is 51 months in prison, which is at the

19   bottom of the guideline range, three years of supervised

20   release.  The government would not recommend a fine, given the

21   amount of the restitution, the $400 special assessment and the

22   amount of the restitution as the Court has already stated.

23         The reasons primarily for this recommendation, first

24   of all, and probably most importantly, is the seriousness of

25   the offense.  If we focus on the amount at issue, which is over

1    $1.1 million, the length of time, which is about a year and a

2    half over which this took place, that it was committed by an

3    attorney --

4            THE COURT:  Can I just understand how many closings

5    were done during that time period?

6            MR. BALTHAZARD:  How many closings overall did she do?

7            THE COURT:  Yes.

8            MR. BALTHAZARD:  I do not know the answer, your Honor.

9    May I just have a moment?

10           THE COURT:  Sure.

11                         (Pause)

12           MR. BALTHAZARD:  I don't have anything for that time

13   period.  I do note that in Exhibit 1 to the government's

14   Sentencing Memorandum, which is her CATIC application for

15   agency which was granted from December of '03, at that time she

16   represented that she had conducted 180 real estate closings,

17   but that did not cover the offense conduct period of time.

18           THE COURT:  Is this the first time that she functioned

19   as an agent of a title insurance company?

20           MR. BALTHAZARD:  I am not aware that she represented

21   any other title insurance company before that.

22           THE COURT:  Okay.

23           MR. BALTHAZARD:  She was admitted to practice in '01,

24   and this application to CATIC was December of '03.

25           We have also in this case three different types of

1       victims.  We have the lender who actually provided the funds,

2       the title insurance company in this case, both of whom, as the

3       Court has heard, had to rely on her services, had to rely on an

4       attorney to represent their interests, to carry out the

5       closings, to do all of the things that she was obligated to do

6       on their behalf.

7              Also, the fact that in this case the funds ultimately

8       ended up either indirectly or directly for her personal benefit

9       either through direct use of proceeds commingled for personal

10      expenses or that the funds went into her operating account and

11      were used generally for running her business for other --

12             THE COURT:  Let me understand how the impact on the

13      individual borrowers, how that works in this context.  I have

14      information from the Bembridges, representations regarding the

15      Bembridges that it has had an adverse effect, obviously, on

16      their credit and that sort of thing.  Presumably they are being

17      asked by somebody to pay some more money.  So, I guess I want

18      to understand.

19             MR. BALTHAZARD:  Presumably.  The initial impact on

20      them was to learn at some point that, in fact, she had not done

21      what she was obligated to do, that she had not paid off the

22      underlying mortgage, that they were at that point obligated on

23      two mortgages on their one property, essentially doubling what

24      they were owed on a monthly basis in general figures.

25             I don't have the information as to what their current

1    negotiations are.  I understand that the Bembridges have

2    retained an attorney to represent them in negotiating with the

3    lenders and trying to resolve their situation.  I believe their

4    property went into foreclosure.  I believe that all three of

5    the properties ultimately were foreclosed on.

6              Mr. Wood did not submit a Victim Impact Statement.

7    Mr. Wood in this case -- in addition to just being a lender

8    homeowner, Mr. Wood had actually sought out Ms. Goode-James to

9    assist -- not assist him and represent him, but he had sought

10   her out in connection with his refinancing because he had had a

11   prior relationship with her, he knew her and knew her as an

12   attorney.  So, there was that breach of trust, even though,

13   again, he was not directly a client at that point, but this was

14   not a situation where --

15             THE COURT:  Well, just so I am sure I understand this,

16   each of the borrower victims remains obligated, as a legal

17   matter?

18             MR. BALTHAZARD:  As a legal matter --

19             THE COURT:  Put to one side as a practical matter

20   whether some negotiation can be made.  They are obligated for

21   the amount of both the loan made and the loan not discharged,

22   and they are obligated to whoever but probably CATIC on this?

23             MR. BALTHAZARD:  Ultimately CATIC would be the other

24   lender.

25             THE COURT:  Right, because it is taking over the

1    settlements.

2         MR. BALTHAZARD:  Exactly.  That is with respect to two

3    of the properties, the Speedwell Street, which was owned by the

4    Bembridges, and Brookledge Street, which was owned by Mr. Wood.

5         The Beauford Lane is a different situation.  That was

6    originally purchased in the name of Shelly Britto, who was a

7    friend of Ms. Goode-James, and Ms. Britto understood that she

8    was essentially buying it in name only, that it was an

9    investment -- that's how it was represented by Ms. Goode-James

10   -- and that Ms. Goode-James was going to be handling collecting

11   the rent and paying the mortgage.  That was the original

12   purchase and the original loan.

13        And then, unbeknownst to her, Ms. Goode-James effected

14   a transaction that really was a sham conveying title to her

15   husband, and that was the second transaction in which she

16   obtained -- in which the second loan was obtained from which

17   she took the proceeds.  That title was never actually recorded.

18   So, in that situation, Ms. Britto still only remained obligated

19   on the first mortgage, not the second.

20        THE COURT:  So, the second mortgage has never been

21   recorded, and consequently --

22        MR. BALTHAZARD:  No.  I believe the second mortgage

23   was recorded but the transfer of title to Mr. James was not

24   recorded.  There was no recorded deed from Ms. Britto to

25   Mr. James.

1        THE COURT:  So, who owns the property now, as far as

2    you are concerned, if you know?

3        MR. BALTHAZARD:  I don't know, but the title -- there

4    was no recorded deed to Mr. James.  The record reflects that it

5    is still owned by Ms. Britto.

6        THE COURT:  Do you want to speak to the personal

7    circumstances that have been raised in the defendant's

8    Sentencing Memorandum and the very substantial letters in

9    support?

10        MR. BALTHAZARD:  I do.

11        Well, I would first like to say with respect to her

12    argument that the Court should show leniency because of the

13    good that she's done in the community, I think the substantial

14    harm that's been done to other people in the community, in

15    particular Mr. Wood and the Bembridges, and even, arguably,

16    Ms. Britto, is to the contrary and outweighs that.

17        And I really think that the letters, they are

18    significant, and I think it says something about her that these

19    people are willing to write these letters.  But in reading the

20    letters -- and this sort of brings me to the issue of

21    deterrence in this case, which I think is important and

22    important beyond just the purpose of deterring other attorneys

23    from stealing client funds, and I think that that is an

24    important factor -- but the people that she worked with and the

25    letters, they I think seem to reflect a lack of understanding

1    of what this is about or the significance of this case.

2    Granted, they are focused on her good qualities, and that is

3    why they submit these letters, but there seems to be a real

4    disconnect between how she holds herself out as a role model

5    and somebody who is trying to help her community and her

6    actions in this case and what she seems to be seeking as a

7    consequence of that.  She seems to be saying that, Because of

8    all that I should get some type of lenience, and I am not sure

9    what sentence in particular she's going to be arguing for, if

10   any particular sentence, but I think it's just to the contrary.

11        She's holding herself out and has held herself out as

12   a role model to these people.  She's got this *Career Road Map*

13   *for Girls* DVD, she's continuing to hold herself out as a role

14   model both with that DVD -- according to the PSR and the

15   sentencing memorandum she goes out and she speaks to young

16   people and others in the community.

17        I think it's the wrong message in this case to send

18   that you can make something of yourself, you go to school, you

19   work hard, you make something of yourself, you become a

20   professional and you steal from your clients and there is no

21   real consequence to that.  I think that's the opposite of what

22   she wants to be or what should be said to these young girls

23   that she's trying to reach out to and help.

24        She talks in the materials and on her website about

25   helping these young girls when they are faced with difficult

1  choices and what you are supposed to do.

2  I think the message that should come from the Court

3  today is that you do the right thing, you do get a good

4  education, and when you are faced with a difficult choice and

5  one of them is you steal from your clients, people who trust

6  you, you commit a crime, that's not the way you go, and if you

7  do that there's going to be significant and harsh consequences

8  to that.

9  I think that that really is the answer to those

10  letters and the background that she has, that it really doesn't

11  speak to a lesser sentence; it speaks to the need to send the

12  right message to those people who are aware of her situation

13  and are looking to see what is going to happen here today.

14  THE COURT:  All right.  Thank you.

15  Mr. Sultan.

16  MR. SULTAN:  Thank you, your Honor.  I think the Court

17  is in the position today of having to sentence an extraordinary

18  person for what I can say, and I don't mean to minimize it, is,

19  in this courthouse at least, a garden-variety kind of a crime.

20  In that sense, I think this case exemplifies the kind of case

21  where the Court can make and should make a different decision

22  in --

23  THE COURT:  I am captured by the reference to

24  "garden-variety," which may have been an improvident use of

25  words, because you are correct that I see embezzlements on a

1    regular basis, not so regular on the part of attorneys.  But

2    there is a hierarchy of these crimes that is basically driven

3    by the amount of money involved, and this is an extraordinary

4    amount of money --

5              MR. SULTAN:  Oh, I understand that, your Honor.

6              THE COURT:  -- and you know I am going to ask where

7    did it go.

8              MR. SULTAN:  I understand it's a lot of money, and I

9    understand that that is what drives sentencing to a

10   considerable extent, but nevertheless, we are in a post-Booker

11   world, where the Court is no longer completely hamstrung by

12   that consideration.

13             THE COURT:  It is not a matter of being hamstrung, and

14   you understand I am trying to ensure that you are speaking to

15   the things that are on my mind.

16             MR. SULTAN:  Yes, your Honor.

17             THE COURT:  One of the things that is on my mind is

18   disparity.  I will use as an example, just because it is an

19   example, a recent one.  I sentenced an individual who took

20   Social Security checks for his father.  His father had been

21   dead for 15 years.  He kept taking them.  It was $200,000.  He

22   was 63 years old.  I imposed a sentence of 18 months on it.  It

23   was a guideline sentence.  I thought it was within the range of

24   that, but I recognized that he had an otherwise -- not a life

25   of extraordinary work that Ms. Goode-James has, admittedly, but

1   except for stealing over $200,000 of the government's money, a

2   layman's life.

3           This is a case of, except for taking a million,

4   hundred-thousand and some change of other people's money,

5   including people who are every bit as vulnerable as some of the

6   people that she has devoted her life to, when I look at it as

7   garden variety, then it seems to me to fall in predictable

8   patterns.

9           MR. SULTAN:  Well, your Honor, as I said in my

10  sentencing memo and I will repeat today, I think in terms of

11  the offense conduct it is, I think in terms of the offense

12  conduct.

13          And I think the Court is absolutely right to be

14  concerned with disparity.  Your Honor sentences lots of people,

15  but there are certain disparities where it is appropriate for

16  the Court to take into account the individual who is before it.

17  It's not merely to sentence every individual to precisely the

18  same sentence for precisely the same offense, which is

19  essentially what the *Guidelines* prescribe.

20          THE COURT:  Well, no.  The sentencing office asks me

21  to tailor the sentence properly to the individual and all of

22  that.  But one of the considerations always is, and it arises

23  more in white-collar crime, broadly conceived, good works for

24  the community, lots of money taken.  Here the good works for

25  the community are part of her genes, not something that she

1    reached out to do.  It seems to me that she was from a very

2    early stage in her life committed on that.  And she has had

3    difficulties in her life, although some of her own making.

4    Lots of people have difficulties in their life.

5         But I wonder how I get untethered from the harm to the

6    borrowers, who are vulnerable, and the amount of money.

7         MR. SULTAN:  Well, let me talk about those two issues,

8    then, your Honor.

9         With respect to the harm to the borrowers, and it is

10   an important issue, let me say a couple of things.  First,

11   based upon CATIC's own submission, at least that I saw to the

12   Court, as I understand it CATIC is on the hook, basically.

13   CATIC is responsible under its agreement to essentially cover

14   any defalcation of its agents on these transactions.  So, I see

15   no evidence that any of these individuals are on the hook for

16   anything.

17        THE COURT:  That may be so.  That is why I was asking

18   these questions early on.  I do not really know what the

19   defenses that the Bembridges can put up are, if they can even

20   mount a defense, which is a costly undertaking in any event, so

21   they have to negotiate.

22        But this much I know; that on its face they are on the

23   hook for other loans, and I am not sure that they have a claim

24   over against -- I do not know what kind of claim they have over

25   against CATIC under these circumstances.  I can conceive of

1     them, that CATIC stands in the shoes of Ms. Goode-James in more

2     ways than one.  But what has happened is that these people's

3     lives have been profoundly affected and not for short money.

4     This is the core of somebody's life.

5            MR. SULTAN:  Well, I don't minimize that, your Honor.

6     And, frankly, even if they are not on the hook for the money,

7     as Mr. Bembridge's letter indicates this had a huge effect on

8     his and his wife's credit rating.

9            But on that point, let me just say one thing.

10    Mr. Bembridge raises a very important point in his letter,

11    which is, he says he doesn't understand why it took basic -- in

12    December of 2008, which is when he is first retaining counsel

13    and dealing with his situation, he doesn't understand why it

14    took so long for somebody to figure out basically that he

15    didn't do anything wrong and to rectify his credit rating.

16           Now, Ms. Goode-James, through me, went to the Suffolk

17    County Prosecutor in April of 2008.  She's not off the hook.

18    She started this, this is her crime.  But, frankly, I don't

19    understand why after April of 2008 the banks, the title

20    insurance agency and the government didn't take steps to make

21    sure these individuals were not being unfairly essentially hit

22    with the consequences and with the notion that they had failed

23    to pay a debt.

24           THE COURT:  It is not quite in the category of blaming

25    the victim, but it comes close.

1          MR. SULTAN:  Well, I am not blaming the victim, your

2     Honor, but the fact is that there was a period of time when --

3     efforts were not made to mitigate damages, I suppose is what I

4     am saying.  And I am not in any way minimizing

5     Ms. Goode-James' -- this is her fault, and she takes

6     responsibility for what happened.  But I just think that's

7     something that should be -- your Honor raised that issue about

8     to what extent this has hurt the borrowers, and I think it's a

9     point that I need to make.

10         THE COURT:  I do, and I guess I think, without having

11    really any full understanding of the respective

12    responsibilities of the several victims here, that's why I

13    asked the question early on, she is a substantial motivating

14    cause of the harm to them --

15         MR. SULTAN:  Of course she is, your Honor.

16         THE COURT:  -- and that cannot be shifted to other

17    people.

18         MR. SULTAN:  Absolutely not.  That's hers.  That's on

19    her.  Yes, your Honor.

20         And as far as the amount of the loss, yes, it's over

21    $1,000,000, and that's a lot of money, and I have, through my

22    investigation, through looking at all of the records, through

23    speaking to my client, I don't think I can say to the Court it

24    went to this spot.

25         I think a couple of things are clear.  It was

1  commingled with all of her other business accounts that were

2  real estate transactions that were coming in and out all the

3  time.  Yes, there were expenses out of that account that went

4  to her that went to personal expenses, paid off credit cards,

5  dinners.

6         There is no evidence at all that she was living some

7  flamboyant, luxurious lifestyle, there's no evidence that she's

8  got some pot of money sitting somewhere.  So, I can't give the

9  Court a clean answer to that, but the fact is she took the

10 money, she used the money, and she is responsible for that

11 money.

12        THE COURT:  It seems like a lot of money to go through

13 in a relatively short period of time.  I see the government

14 gives me snippets like paying off her husband's Jaguar or

15 references to various kinds of higher-end merchandise outfits.

16        But I am just searching for what happened to it.  It

17 is one thing to say, "We had an unbelievable medical problem

18 and it was devoted to that."  That is something I see all the

19 time in embezzlement circumstances, which I broadly conceive

20 this to be.  But I do not see anything.  This is just kind of

21 augmenting income.

22        MR. SULTAN:  Your Honor, this was also a time when

23 there were these real estate transactions that were going on in

24 the community, and to the extent that in a misguided way to try

25 to help people she advanced certain people monies.  That is

1    where part of it went, but she is not in a position to come

2    before the Court and account for that, and, therefore, I don't

3    feel comfortable saying basically she used this money for good.

4         THE COURT:  Well, when you say "advanced money," I am

5    not sure I understand that.

6         MR. SULTAN:  Well, people who didn't have funds to pay

7    their mortgages and were in danger of foreclosure, that perhaps

8    she loaned money to those people.

9         THE COURT:  But without documentation.

10        MR. SULTAN:  Correct, your Honor.  But I am not here

11   to tell the Court -- I can't prove that, your Honor, and

12   therefore, I am not comfortable making a representation to the

13   Court that she was, you know, basically functioning as Robin

14   Hood.  That's not what I am saying to the Court.

15        I am saying I cannot account for the money, but there

16   is no evidence it went to her living a luxurious life or that

17   she has any money stashed anywhere, and that's really all I can

18   say.  I understand that doesn't completely satisfy the Court's

19   curiosity, but that is really the best we can do with it.

20        THE COURT:  Well, it is not idle curiosity.

21        MR. SULTAN:  It's not idle curiosity, your Honor.  The

22   Court has a right to know that, to ask that question in light

23   of the issue of sentencing.

24        Now, one of the things about the amount of loss, and

25   it is a lot of money, but under the *Guidelines* again, frankly,

1      if the amount of loss was twice the amount it would fall in the

2      same guideline range.  So, it's a pretty wide swath that the

3      *Guidelines* cut in this area, and, yes, she is over that

4      threshold.

5              THE COURT:  Not to be arch about it, but wasn't it

6      Everett Dirksen who said, "A million here, a million there, it

7      is going to add up after a while"?  This is a lot of money no

8      matter what.

9              MR. SULTAN:  Your Honor, I am not minimizing the

10     amount of money.  I would not stand here and tell the Court

11     there should be no serious consequence for this.  This is a

12     serious crime, she is a lawyer, it's over a million dollars.

13     You start there, okay?

14             So, I understand the Court starts there.  That's why

15     we start with 51 months, which is a lot of time in prison for

16     somebody who has basically lived an exemplary life.  So, I

17     guess I understand the Court starts there and properly starts

18     there, but I want to at least argue to the Court that there are

19     some good reasons why the Court should deviate substantially

20     from that number.

21             I know a lot of this is laid out in my memo.  If the

22     Court will indulge me for a few minutes I just want to give the

23     Court some reasons.

24             THE COURT:  Sure.

25             MR. SULTAN:  Ms. Goode-James has -- the contributions

1   she's made to the community, your Honor -- and your Honor

2   talked about disparity, but there are different kinds of

3   people, and she is a person who has put her heart and her soul

4   into her community for decades.  Does that make her different

5   from some other people?  Yes, it does.  Is that something that

6   should count for something when she's before the Court to be

7   punished?  I submit it does.

8            And if the Court looks at the letters -- for example,

9   the letter of Mr. Dohan, who is here, Exhibit 10, who was her

10  supervisor at the Youth Advocacy Project for many years.  I

11  mean, that letter, to me, that's Exhibit 10, really it gives

12  the Court such insight into who this person is and what she

13  did, how hard she worked to help the young people particularly

14  in her community for years and years and years.  That's who she

15  is.

16           This crime is also part of who she is, but in the

17  context of her life this crime is aberrant.  Yes, it wasn't a

18  one-time thing; she did it three times over three years.

19           THE COURT:  Is it over three years or a year and a

20  half?

21           MR. SULTAN:  Well, one in late 2005 -- you're right,

22  your Honor -- late 2005 to early 2007 -- it's over a year and a

23  half.  But it was three different occasions, and as she

24  explains in her letter to the Court, which is Exhibit 1, sort

25  of once she did it she kept doing it and she didn't know how to

1    get out of it.  That's no excuse, but in the context of her

2    life, which has been an extraordinarily giving and generous

3    life, this is aberrant conduct.

4           Now, her contributions to her community should also be

5    looked at in the context of the struggles that she'd had to

6    undergo.  And your Honor alluded to them.  Yes, everybody has

7    tough times in her lives, that's true, but she has had some

8    particularly tough times.

9           She was a teenage single parent, and as a single

10   teenage parent she decided she was inspired to go to college,

11   to go to law school.  She worked her way through college and

12   law school.  Yes, she did receive a small scholarship, the

13   Wayne Budd scholarship in law school, but that was for less

14   than $1,000.  She worked her way through college and law school

15   as a single parent because she wanted to become a lawyer.  This

16   was her dream, to help her community by being a lawyer.  It was

17   not easy for her, and she ultimately succeeded in fulfilling

18   that dream.

19          And then, having fulfilled that dream, she got herself

20   into an abusive marriage, a seriously abusive marriage, and,

21   yes, I guess that's her fault, she chose the person that she

22   married, but that was immediately before this offense conduct

23   began.  As Dr. Baxter's report indicates, I mean, it was

24   against the backdrop of these things that were going on in her

25   life, which were pretty overwhelming.

1          She was a solo practitioner in Roxbury with no backup.

2    She had one person working for her and he got murdered and he

3    was someone who was very close to her.

4          None of these are excuses, but this is a woman who was

5    really kind of, you know, lost at sea, and she's lost at sea

6    and with all of these things happening to her, and now she's in

7    the situation where millions of dollars are being funneled

8    through her accounts without anybody really paying attention to

9    where they're going or what's happening.  And she, in that

10   situation, under those pressures and whatever other motivations

11   she had, she succumbed to a temptation, and she's suffering and

12   she's going to suffer a tremendous consequence for it.

13         When it did start coming to light, initially through a

14   BBO complaint, she immediately wanted to take responsibility.

15         THE COURT:  Let me understand the chronology --

16         MR. SULTAN:  Yes, your Honor.

17         THE COURT:  -- of that.  There is a BBO complaint by

18   whom?  Was it CATIC?

19         MR. SULTAN:  I think it was -- it started with a

20   bounced check, your Honor, in the Fall of 2007, but then there

21   was a CATIC complaint I think in December of 2007.  The CATIC

22   complaint was on one of these three properties.  I forget which

23   one, but it was one.

24         And after that happened, number one, she voluntarily

25   agreed to a suspension of her license immediately; and, number

1   two, she authorized me or directed me in April of 2008 to go to

2   the prosecutor.

3          At that point I went to the Suffolk County District

4   Attorney's Office and asked to meet with them and not only told

5   them about all three of these transactions, gave them documents

6   basically saying this is what my client has done, she wants to

7   take responsibility, she's prepared to be prosecuted and plead

8   guilty.

9          Now, that was after the BBO was investigating.  I am

10  not pretending that she did this at a time when nobody knew

11  about this, but she did it very early.  I had no reason to

12  believe at that point there was a criminal investigation,

13  although certainly you could look at the facts and say, well,

14  one's coming down the pike.

15         THE COURT:  Hard to believe that there would not be a

16  criminal investigation.

17         MR. SULTAN:  Well, I think that's right, your Honor.

18  But as soon as -- very early she wanted to own up to it, and

19  not only own up to it legally, but I think she had a sense of

20  shame and remorse and all of those things that go with it, and

21  she had trouble opening up to her family, to her husband, to

22  her parents.  She was dealing with the reality of what she had

23  done.  As soon as we learned that there was, in fact, a federal

24  investigation --

25         THE COURT:  When was that?

1          MR. SULTAN:  Your Honor, it was the beginning of -- it

2     was at the end of 2008 or the beginning of 2009.  I am not

3     sure.  I think her husband received a subpoena, a grand jury

4     subpoena, and that is when I learned for the first time and my

5     client learned that there was a federal investigation.

6          THE COURT:  Was that in connection with the Britto

7     transaction?

8          MR. SULTAN:  It was all three, your Honor, at that

9     point.  I called the prosecutor, whose name was on the

10    subpoena.  I said, "My client wants to take responsibility; she

11    wants to plead."  She agreed to draft an information.  She

12    asked me to come in to go over the facts, and that's how we

13    proceeded.  So, again, it was after it had begun to come to

14    light, and I don't mean to suggest otherwise, but in the scheme

15    of things it was early, and she owned up to it and she didn't

16    want to fight about anything.  She basically said, "I did

17    this," and, you know, "I need to take the consequences."

18         Your Honor, with respect to her character, again, I

19    think that the letters are important, and the letter from

20    President Jenkins-Scott of Wheelock College, her husband's

21    letter, her own letter, again, I think give the Court some

22    insight into what an unusual, what a giving, what a

23    compassionate person Ms. Goode-James is and has been throughout

24    her life.

25         Now, the prosecutor says, well, she shouldn't go

1    around sort of holding herself out as a role model.  I have a

2    problem with that argument, I think, because, yes, she's done

3    what she's done.  She could, I suppose, hang her head in shame,

4    stay in her house and not do anything constructive for the rest

5    of her life, but that's not who she is.  She is going to take

6    the consequences that this Court imposes and she's going to go

7    on trying to help people, because that's who Andrea Goode-James

8    is.

9         And as President Jenkins-Scott of Wheelock College

10   says in her letter, Exhibit 9, she says that she is an

11   excellent role model.  "She is an example for our students of

12   how one can get entangled in a downward cycle where one's

13   values and integrity are compromised."  That certainly happened

14   here.  "Yet, she demonstrates that during such challenging

15   times, one can also reclaim one's integrity and purpose in

16   life.  An important lesson to learn."

17        So, I think it's to her credit that she's out there

18   making this *Career Road Map for Girls*, that she's out there

19   trying to do as much good in her community that she can for

20   every day that she has to do it in the community with every

21   breath in her being, and I think that speaks volumes about who

22   she is.  She is not doing it to impress the Court, she is doing

23   it because that's the person that she is.  That's why all these

24   people are here, because they know who she is as a human being,

25   not just for the offense conduct that she committed.

1        For all those reasons, your Honor -- and, finally,

2    your Honor, there is her family situation.  And I said in my

3    memo, look, everybody has a family, and it hurts family members

4    in every case when a loved one goes off to prison, there is no

5    doubt about that.

6        She has a four-month-old baby boy who needs his

7    mother, and that is something that I think the Court can take

8    into account.  Does it wipe out everything else?  Of course

9    not, but it's part of what's before your Honor.

10        THE COURT:  Well, here is the issue -- and it is not

11    something I think I properly can inquire in except to note --

12    which is that using the chronology that we dealt with, the

13    decision, to the degree it was a conscious decision to have

14    another child, took place at a time when she was exceptionally

15    vulnerable, vulnerable to some consequences.

16        MR. SULTAN:  Well, your Honor, she had a new husband

17    and they wanted to have a child together, and she's at the age

18    where it was now or never.  So, again, I suppose the choice is,

19    well, sorry, you're facing a criminal investigation, you

20    shouldn't have a child, or you go and live your life.

21        THE COURT:  It is different from that, and this is, I

22    think, a very challenging aspect of it.  It is the

23    sword-and-shield problem that is presented by an argument about

24    a very young child who is brought into the world at a time of

25    vulnerability for the parents.  All of those things should be

1    affirmed, that is, the choice to have children and realize

2    aspects of the marriage.  On the other hand, is it a factor to

3    be considered and grounds for departure or deviation, or does

4    it just simply fall out of it?

5        There is a larger issue here.  Maybe you want to

6    address it, maybe you do not.  The *Guidelines* used to say that

7    they were gender-neutral, which has a nice sound to it in other

8    contexts.  But as a practical matter, mothers, women, bear

9    different responsibilities and create different vulnerabilities

10   for loved ones.  Now, maybe as a matter of social policy or

11   public policy, we just say, well, men and women are equal, and

12   it is the equality of forcing them to live under the bridge or

13   at Framingham or at Danbury.

14       But it is a troubling problem to me, because I am not

15   sure that as a practical matter that is the case.  The

16   sentencing of a woman, a mother, imposes additional impacts,

17   collateral damage, if you will, that is not necessarily true of

18   husbands or men in the customary conventional social

19   organizations that we have.

20       Now, the question for me is do I take that into

21   consideration in this context?  If it were Mr. James would I

22   take it into consideration in the same way?

23       MR. SULTAN:  Well, I think it's a great question, your

24   Honor, and I think the reality -- and I am saying this

25   anecdotally -- is that women in this courthouse and in other

1    courthouses generally receive more lenient sentences than men.

2    I can't prove that, but that's certainly what I believe to be

3    the case, and I believe that part of the reason for that is

4    exactly what your Honor just articulated, that they are, in

5    fact, in a different situation, particularly with respect to

6    their family responsibilities, and Courts, properly or not,

7    take that into account.

8         And I think they should take it into account not as a

9    grounds for departure.  If we were talking pre-Booker about

10   whether that constitutes a ground for departure under Section

11   Five of the *Sentencing Guidelines*, I would agree that it

12   doesn't.  But now, under a broader consideration of the

13   character and circumstances of the defendant, I think the

14   Court, frankly, is stuck now with the much more difficult job

15   of taking it all into account, and that's why your Honor has

16   life tenure and that's why it's your call not to call the

17   Sentencing Commission.

18        So, I think it's part of the whole ball of wax, it's

19   part of what the Court is doing in sentencing her, and I don't

20   think the Court should turn a blind eye to any part of that

21   totality of circumstances.  It's a difficult task the Court

22   has, I understand and I agree with that, but I think properly

23   so, I think properly so.

24        I think if the Court takes all of those circumstances

25   into account that I've outlined, particularly who she is, who

1     she's been, then I think the Court will agree that a 51-month

2     sentence in this case is far more than necessary and is not

3     appropriate under all these circumstances, and that a

4     substantially lesser sentence is appropriate.

5              I haven't come up with a sentence.  Obviously,

6     Ms. Goode-James would be much happier not being separated from

7     her family, being in a halfway house.  If the Court doesn't

8     choose to do that and she has to go away for a period of time,

9     she will do whatever the Court, obviously, orders, and she will

10    be the same person; she will come out the same person that she

11    is now and come back out and help her community when she comes

12    out the same way when she went in.

13             But I ask the Court to take the totality of

14    circumstances into account, not look at this in a

15    straight-jacketed, guideline kind of way.  Recognize that, yes,

16    we are talking about disparity, but she is a unique individual.

17    She deserves to be treated in some respects differently from

18    other people who don't share her history, her background, her

19    contributions to her community.

20             And if the Court takes those into account, I think the

21    Court will reach a conclusion that a substantially lower

22    sentence than the guideline range is justified here in the

23    interests of justice.

24             Finally, your Honor, if the Court is disposed to

25    sentencing her to incarceration, I would ask the Court to allow

1  her to self-report and to recommend that she serve any term --

2  recommend to the Bureau of Prisons that she be designated to

3  Danbury so at least her family will be able to visit with her

4  with as little inconvenience as possible.

5          I thank the Court for its time.

6          THE COURT:  Thank you, Mr. Sultan.

7          Ms. Goode-James, I will hear from you if there is

8  something you would like to say at this point.

9          THE DEFENDANT:  Thank you, your Honor.  Your Honor, I

10 would like to again offer a profound apology.  Your Honor, I

11 would like to offer a profound apology to Shelby Britto, Lionel

12 Wood and Lionel and Verona Bembridge and to express my deep

13 regret for the harm my actions have caused.

14         I realize that the financial loss my actions have

15 caused the lenders and CATIC, who were my clients, pales in

16 comparison to the damage I may have caused to the sanctity and

17 public trust that is imperative to be upheld by attorneys in

18 the practice of law.  I have compromised this most important

19 professional responsibility.  Regardless of my intentions, my

20 actions were illegal and unethical, and I am sorry.

21         Initially I made irresponsible choices with the intent

22 on helping a few families stop impending foreclosures on their

23 homes.  Those actions turned into a web of misappropriating,

24 co-mingling and juggling of money in and out of my client

25 account in the hopes of eventually overcoming the financial

1    deficit caused when I was unable to close out the last bailouts

2    I attempted.

3           In closing, I would like to state that I am deeply

4    anguished by the dilatory and offensive effects my conduct may

5    have had on other lawyers and the practice of the law.  I have

6    had the privilege of observing, knowing and at times practicing

7    with some of the most upstanding and outstanding

8    representatives of the profession.  I had a responsibility to

9    uphold the ethical responsibilities of this profession, and I

10   failed.

11          I would like to thank my counsel, Attorney James

12   Sultan, for his outstanding representation and assistance with

13   my desire to swiftly accept responsibility and make known my

14   intent to plead guilty.

15          Finally, your Honor, I would like to apologize to my

16   husband, my children, my parents and my friends.

17          I am sorry for the disappointment and pain I have

18   caused you throughout this.

19          From each of them I have received unconditional love

20   and support, and I am grateful.

21          I thank you, your Honor, for the opportunity to

22   express myself, and I respectfully submit to the sentence

23   imposed, your Honor.  Thank you.

24          THE COURT:  Thank you.  Well, as the colloquies made

25   clear, this is about as difficult a sentencing as I have ever

1    encountered because of the dissonance between all of the things

2    that Ms. Goode-James has done in her life and the bad things

3    that bring her before us.

4         I have given a great deal of thought to this.  I

5    watched a portion of the DVD, the first disc, a second time

6    last night.  I have looked at the letters that have been

7    submitted, and they are the most impressive collection of

8    letters that I believe I have ever received in 23 years, some

9    from persons I know by reputation and who, by reputation, I

10   view highly, but others who seem to me to be speaking directly

11   about Ms. Goode-James' qualities.

12        Of course, I start with the *Guidelines*.  That is the

13   point at which I must begin my analysis, but it is not the

14   point at which I end it.  I am obligated to deal with factors

15   of sentencing that are embodied in Section 3553, the first

16   being the seriousness of the offense and the need to promote

17   respect for the law.

18        The *Guidelines* are calculated, I think, in the way

19   that they are to deal with what was perceived to be a problem

20   in the sentencing of defendants in the Federal Court, that it

21   was sociologically tilted, that violent crime or blue-collar

22   crime received more severe sentences than white-collar crime;

23   and so, as a consequence, the drafters of the *Guidelines*

24   substantially upped the sentences to be imposed on white-collar

25   crime.

1          Now, why is that?  Well, one is a desire to ensure a

2     lack of unwarranted disparity.  Another is a kind of democratic

3     impulse that people at all stages of society should be equally

4     responsible.

5          It is an implementation of the observation that Judge

6     Friendly once made that one can steal as easily with a fountain

7     pen as he can or she can with a crowbar.  There is a certain

8     bumper-sticker quality to that, I suppose, but it does not

9     begin to come to grips with the larger issues of sentencing, I

10    think.

11         So, I start with the proposition that it is the

12    considered judgment of the *Sentencing Guidelines* and it

13    reflects an important public policy as a general proposition

14    that sentencing for embezzlement offenses involving this amount

15    of money should be treated with great seriousness that

16    approximates what would happen if someone did this by burglary

17    or bank robbery without violence.  But it does not begin to

18    come to grips, as I say, with the underlying circumstances of

19    those who are in a position to conduct this kind of crime.

20         Nevertheless, I stated at the outset that I think that

21    the 51 months is a sentence that properly reflects the

22    seriousness of the offense and promotes respect for the law in

23    the fashion that, as a democracy anyway, in the broadest

24    possible sense we have said is appropriate.

25         So, I turn to the question of specific deterrence or

1    general deterrence, which is a companion to this question of

2    seriousness of the offense:  What does it take to keep, putting

3    it at the specific level, those who are charged with the

4    responsibility of acting as closing attorneys for lenders and

5    title insurance companies from engaging in this kind of

6    embezzlement?  That is an issue that does not lend itself to

7    double-entry bookkeeping; there is no fixed figure.  What I can

8    say is that I am obligated to impose a sentence no greater than

9    is necessary to keep them from doing this.

10        So, what do I say in analyzing this?  I ask the

11   question would it make a difference to the title insurance

12   lawyer contemplating this kind of activity that it is 51 months

13   versus some other figure, and I cannot say that within ranges

14   that it would.  The critical breakpoint is this period of

15   incarceration, I think, the loss of the right to practice law.

16        So, I look at this from the perspective of general

17   deterrence.  I do not think that it is necessary to impose a

18   51-month sentence to obtain general deterrence for the targeted

19   group specifically defined and more generally defined.

20        I then turn to the question of specific deterrence.

21   The one way of looking at this and kind of the reflexive way of

22   looking at it is what do we need to do to keep Ms. Goode-James

23   from stealing from the title insurance company again?  Well,

24   nothing.  She has lost her ticket; she is not going to be

25   working for the title insurance company anymore.

1          But that asks a larger question, which is what kind of

2     person are we dealing with here, a person who is likely to

3     recidivate, do it again?  It seems to me that element opens up

4     the issues that Mr. Sultan alluded to and that we discussed.

5          I said during the course of that colloquy the good

6     works that Ms. Goode-James has done, the commitment that she

7     has shown, seems to be in her genes, which is a broader way of

8     saying that she grew up in a family that prided the opportunity

9     to serve others in her community, and she did it, and has done

10    it and continues to do it.  While there is a certain irony in

11    the role-model discussion, perhaps it is a way of recognizing

12    that people, all people, are vulnerable and capable of

13    committing crimes, and are capable of redemption, and are

14    capable even before they commit crimes of great good works.

15         In this case the great good works are much broader

16    than anything I have ever seen.  I will see the corporate

17    executive who has served on boards and so son, and those are

18    good works and should be affirmed.

19         But this is a woman whose life has been involved in

20    good works, and that informs my judgment about is she going to

21    recidivate again as the specific deterrence issue.  Here,

22    again, I ask myself, well, what is necessary to keep her from

23    doing it again?  I can give the cheap answer, which is not

24    much, because she will not get a chance to have her hands on

25    this kind of money again.

1          But that is not the complete answer, I think.  It is

2     how is someone who has been involved in this kind of thing for

3     these kinds of reasons likely to respond in the future to other

4     perhaps less-attractive or less-remunerative opportunities to

5     victimize others.

6          Here, I have to say that I think that there is very

7     little likelihood that she is going to do that again.  It

8     overstates it and makes it much too sectarian to say that this

9     is an epiphany, but the short of it is that it is for her, I

10    think, coming to grips with, fully, her own responsibility for

11    her own life.

12         We can see looking through the report of the

13    psychologist or psychiatrist, I am not sure which she is, but a

14    very thoughtful report by a mental-health professional of

15    various challenges that Ms. Goode-James has faced, not for lack

16    of support through a loving family but through the various

17    kinds of distortions that our society has, both in terms of

18    willingness to accept diversity and perhaps problems of abuse

19    in relationships.

20         Those are real, and one of the things that I wanted to

21    discuss with Mr. Sultan was the differential impact that this

22    has on women in our society.  It is fine and good to say men

23    and women are equal before the law, but not necessarily when

24    you sentence them.  You have to understand, I think, the full

25    range, if you can -- you do the best you can -- of their

1    circumstances:  what has shaped them, what has caused them to

2    be involved in various sorts of ways.  Here there is some

3    explanation, not an excuse, but some explanation for what was

4    done.

5         I take very seriously -- I asked the question because

6    I do, and it is an uncomfortable question about the effect on

7    family and particularly a very young child, an infant.  I

8    suspect that the impact of likely incarceration is not

9    something that was clearly in mind.  The cynical way of looking

10   at the creation of family in this context is to suggest

11   otherwise.  I do not in the slightest, but it is added to the

12   impact of a sentence of incarceration for the defendant, and if

13   I think about specific deterrence as being essentially impact

14   on the defendant, then I have to look at her particular

15   circumstances here, and I do.

16        So, the argument for specific deterrence, it seems to

17   me, is one for reducing the so-called guideline range.

18        I think about the penological benefit -- which is one

19   of the things -- or "penological effect" I suppose is a better

20   way of saying it, but "benefit" may be true here, too -- for

21   Ms. Goode-James.  Does she need to go to prison to learn a

22   skill?  No.  Or to become aware of her shortcomings?  I do not

23   think so.  Or to get a GED or something like that?  No.

24        On the other hand, there is in this role -- I think I

25   will merge into the question of disparity -- there is some

1    value that is -- and I do not want this to be understood as

2    arch or ironic -- but of a role model, someone with some of the

3    gifts that Ms. Goode-James has had.  The support of family that

4    has worked hard to achieve remarkable success is punished the

5    same way everybody else is who gets involved in crime like

6    this, who takes a lot of money from other people, particularly

7    vulnerable people like the Bembridges or Mr. Wood.

8          So, I think of the role of the prison sentence as, in

9    part, exemplary and, in part, consistent within a different

10   sort of way the role model responsibilities that

11   Ms. Goode-James has taken on.

12         Now I come to the disparity.  I raised the question of

13   the most recent kind of embezzlement-type crime that I

14   sentenced here, which was a fellow, who, as I said, was 63

15   years old, had been taking or receiving his father's Social

16   Security checks for the 15 years since his father has been dead

17   and it amounted to over $200,000, and the sentence I imposed

18   was 18 months.

19         I am not sure that increasing the distance between a

20   $200,000, 18-month sentence for an elderly man and whatever the

21   figure is for Ms. Goode-James is in service of minimizing

22   unwarranted disparities.  They are two different people who

23   committed fundamentally the same wrong for a significant amount

24   of money with no apparent justification other than to augment

25   their lifestyle, including in Ms. Goode-James' circumstances a

1   suggestion that some of these monies were put to good works or

2   at least to ameliorate the misfortunes of others.

3          But I see no disparity, unwarranted disparity, in a

4   sentence that is substantially below the guideline range under

5   these circumstances, which brings me ultimately to the final

6   issue.

7          There is a value in the *Guidelines* of the kind of

8   template that the *Guidelines* provide.  They guard against what

9   I started with, which is the danger that judges of a certain

10  background will be more sympathetic to white-collar defendants

11  than blue-collar defendants and, consequently, engage in an

12  unequal application of the law.

13         That is not the case here, I think.  This is a serious

14  crime.  People should be deterred from it.  I am satisfied that

15  Ms. Goode-James will be deterred from this or any other crime

16  in the future.  She has done good works and will continue to do

17  so irrespective of what sentence I impose, I am sure.

18         But my obligation is to impose a sentence that is

19  sufficient but not greater than is necessary to serve the

20  larger purposes of sentencing, and having gone through these

21  larger purposes of sentencing, I am satisfied that the proper

22  sentence to impose here is 24 months' incarceration.

23         I will not impose a fine.  The defendant is not in a

24  position to pay such a fine.

25         I will impose restitution in the amount of

1   $1,141,861.22.  I must impose Special Assessments of $400 in

2   this case.  The restitution will be provided in accordance with

3   the schedule that is set forth in the Presentence Report to the

4   victims of the several transactions at issue here.

5         I will make a recommendation that the defendant

6   participate in a mental-health program, to the degree available

7   at the Bureau of Prisons facility, to address a series of

8   ongoing challenges she has faced in her life and will face in

9   the future

10        As I have said, I am going to impose a period of

11  supervised release.  That will be a period of 3 years.  Within

12  72 hours of release from custody, she must report in person to

13  the District in which she is released.

14        I will require that the defendant make the restitution

15  immediately, but I will suspend the interest payment

16  requirement with respect to it.  It is such a daunting figure

17  that it seems just overbearing to impose interest under these

18  circumstances, and I will not.

19        But the payment, as I said, is due immediately.  If it

20  is not paid immediately, it shall be made according to, first

21  in prison the inmate financial responsibility program which is

22  available there and thereafter on supervised release according

23  to a repayment schedule to be developed by the Probation Office

24  and with my approval.

25        The payments must be made to the Clerk of the United

1    States District Court and that is for transfer to the several

2    victims.  The payments will be made for the benefit of the

3    borrower victims first and thereafter to the lender or title

4    insurance company.

5        Let me be clear about that.  I do not mean to blame

6    the victim; on the other hand, it seems to me that the title

7    insurance companies bear some responsibility for supervision

8    and identifying who it is that they should have working for

9    them.

10       The people who are most vulnerable in this

11   circumstance are the borrowers, like the Bembridges and

12   Mr. Wood, and to the degree that there is some restitution to

13   be made, it should be made to them first.

14       The defendant is obligated to notify the United States

15   Attorney in this District within 30 days of any change in her

16   mailing or residence address that occurs while any portion of

17   the restitution remains unpaid.

18       It is further ordered that the defendant is obligated

19   not to incur any additional lines of credit or open any

20   additional lines of credit without the approval of the

21   Probation Office while any of her financial obligations remain

22   outstanding.  The defendant is obligated to provide the

23   Probation Office with access to any requested financial

24   information, and that, she should understand, will be and may

25   be shared with the Financial Litigation Unit of the United

1    States Attorney's Office.

2          During the period of supervised release, again I will

3    direct the Probation Office to fashion a mental-health program

4    for the defendant, and to the degree that there is available

5    either payment by a third party or her own ability to pay,

6    having in mind that the primary responsibility is to pay

7    restitution, the defendant must pay that.

8          In addition to the standard conditions and mandatory

9    conditions of supervised release, the defendant shall not

10   commit another federal, state or local crime, shall not

11   illegally possess a controlled substance.

12         I note that I am waiving the drug-treatment

13   obligation, because it does not seem to me to be appropriate

14   under these circumstances.

15         The defendant must submit to the collection of a DNA

16   sample, as may be directed by the Probation Office, and must

17   comply, obviously, with all the standard conditions of

18   probation.

19         She is also prohibited from possessing a firearm or

20   other dangerous weapon.

21         I will make the recommendation requested by Mr. Sultan

22   that the defendant surrender after January 1, require her to

23   report not later than January 8 to the institution designated

24   by the Bureau of Prisons, and I will make a recommendation that

25   it be the federal prison camp at Danbury, which seems closest

1     to the defendant's family and will permit an opportunity for

2     them to visit with her, and while I am not in charge of making

3     classification, it seems to me that that is an appropriate

4     facility for the defendant here.

5          Is there any other recommendation or condition that

6     the parties would like me to consider in the judgment?

7          MR. BALTHAZARD:  No other condition, your Honor.  I

8     just wanted to ask with respect to the restitution that it be

9     pursuant to the schedule but as modified and noted in the

10     Government's sentencing memo footnote for just reference to

11     which particular lender is entitled to the restitution on that

12     one property.

13          THE COURT:  All right.  We will modify with respect to

14     the Beauford Street property that $273,203.94 be made payable

15     to HSBC but the remainder of -- $105,000 is still payable, I

16     believe, to CATIC until the settlement is effected.  So, it

17     speaks as of today, and the parties and victims can compromise

18     that, to the degree that they choose to, or their successors or

19     assigns can.  But that is the fixed figure.

20          Is there anything else.

21          MR. SULTAN:  No, your Honor.  Thank you.

22          THE COURT:  You should understand, Ms. Goode-James,

23     that you do have a right of appeal.  You can remain seated.

24     You will want to discuss with Mr. Sultan whether that makes any

25     sense here.

1          I think I have said everything that I can about this.

2     You understand my responsibility is to try to fashion a

3     judgment that composes all of the conflicting interests that

4     are brought into play when someone commits a crime, as you did.

5          I stand by my view that you have had an exemplary life

6     in a variety of different ways and you have served your

7     community well, except here, and that "except" is very

8     important, and that is what leads to this sentence.

9          I have no doubt that I will not encounter you again,

10     although you understand that the period of supervised release

11     for three years means that if something happens, if you get

12     involved in a jam again, that you will come back to me, and

13     then I will have to rethink whether or not I got it all wrong

14     and take whatever steps are necessary.  I do not think that is

15     going to happen.

16          If there is nothing further, then we will be in

17     recess.  Thank you.

18          MR. BALTHAZARD:  Your Honor, I just ask that the

19     defendant be ordered to report down to the Marshals.

20          THE COURT:  Yes.  You should go down to the Marshals.

21     They may not be there tonight, but you will get to them by

22     tomorrow.  All right?

23          MR. SULTAN:  Yes, your Honor.

24          THE COURT:  All right.  Thank you.

25          MR. BALTHAZARD:  Thank you, your Honor.

1              THE CLERK:  All rise.

2         (The Honorable Court exited the courtroom at 5:10 p.m.)

3          (WHEREUPON, the proceedings adjourned at 5:10 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of *United States v. Andrea*

9    *Goode-James*, No. 1:09-cr-10170-DPW.

10

11

12

13

14   Date:May 7, 2012          /s/ *Brenda K. Hancock*

15                             Brenda K. Hancock, RMR, CRR

16                             Official Court Reporter

17

18

19

20

21

22

23

24

25